**ROBINTECH, INC., Plaintiff,**

v.

**CHEMIDUS WAVIN, LTD., Defendant.**

**Civ. No. 76–613.**

United States District Court,
District of Columbia,
Civil Division.

March 22, 1978.

David S. Abrams, Washington, D. C., for plaintiff.

A. Robert Theibault, Arlington, Va., for defendant.

## MEMORANDUM ORDER

JOHN H. PRATT, District Judge.

This matter is before the Court on defendant's two motions to strike certain claims and allegations made in the context of litigation between the parties on the validity of defendant's American patent, U.S.Pat. No. 3,484,900. The claims against which defendant's motions are directed center on alleged misuse of the patent which could render the patent unenforceable against the plaintiff, which holds a license under the patent. Inasmuch as the claim of patent misuse stands distinct from plaintiff's claim of patent invalidity, and there appearing no reason why the misuse issue cannot be considered on its merits, we treat defendant's motion as being a motion for partial judgment on the issue of patent misuse. Fed.R.Civ.P. 54(b).

Defendant's American patent covers an apparatus for forming "an annular internal groove in a length of plastics pipe." U.S. Pat. No. 3,484,900 Abstract col. 1, line 16. The patent was issued December 23, 1969. The apparatus is the subject also of a British patent, No. 1,124,930 (pub. Aug. 21, 1968). The thermoplastics material to which the patented apparatus is applied, and the resulting pipes and pipe fittings, are not themselves covered by defendant's American patent.

The license agreement between the parties was entered into January 1, 1970 between Chemidus Plastics, Ltd. and Universal Pipe & Plastic, Inc., predecessors in interest of defendant and plaintiff respectively. In consideration for the agreement by Chemidus to grant Universal "full but non-exclusive authority" to manufacture and market pipe and pipe fittings made by use of Chemidus' patents and related know-how, Universal agreed to pay fixed sums and royalties to Chemidus and to undertake various other duties in the way of sales promotion, quality control, patent defense and confidential treatment. The agreement was to last at least ten years, and to be renewable for five-year periods thereafter at the licensee's option. The agreement also provided for any disagreement thereunder to be referred to arbitration, and specified that its terms were to be governed and construed according to British law.[1]

It is plaintiff's contention that three clauses in the agreement, taken separately or together, constitute misuse of the United States patent in question. Stated briefly, the doctrine of patent misuse "denies to the patentee after issuance the power to use [the patent] in such a way as to acquire a monopoly which is not plainly within the terms of the grant." *Mercoid Corp. v. Mid-Continent Investment Co.*, 320 U.S. 661, 665–66, 64 S.Ct. 268, 271, 88 L.Ed. 376 (1944). The doctrine is founded in the public interest in free competition. *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 229–31, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964). As a consequence a party invoking the doctrine need demonstrate neither that the alleged misuse constitutes a violation of the federal antitrust laws nor that the alleged misuse has resulted in injury to the party itself. *Morton Salt Co. v. G. S. Suppiger Co.*, 314 U.S. 488, 490, 494, 62 S.Ct. 402, 86 L.Ed. 363 (1942); *Valmont Industries, Inc. v. Yuma Manufacturing Co.*, 296 F.Supp. 1291, 1295 (D.Colo.1969). However, courts will not find misuse of a patent if the patentee's practice "creates no restraint of competition beyond the legitimate grant of the patent." *Automatic Radio Manufacturing v. Hazeltine Research, Inc.*, 339 U.S. 827, 833, 70 S.Ct. 894, 897, 94 L.Ed. 1312 (1950). Generally, a determination that a patent has been misused will preclude a patentee from invoking the aid of the

---

1. An arbitration proceeding has in fact been underway for some time in the United Kingdom; however, this Court declined either to stay this action in favor of the arbitration proceeding or to stay the arbitration in favor of this action. *See* Order of July 13, 1976.

The parties' submissions on the instant issue of patent misuse appear to assume the applicability of United States law. Inasmuch as the issue of misuse requires analysis of the rights conferred by issuance of a United States patent, the law of the United States would seem as pre-emptively applicable here as upon the issue of the validity of a United States patent.

courts in enforcing his rights thereunder, at least for the period of the misuse, *W. L. Gore & Assocs., Inc. v. Carlisle Corp.,* 529 F.2d 614, 622 (3d Cir. 1976), or until the effects of the misuse have been dissipated or purged. *Ansul Co. v. Uniroyal, Inc.,* 306 F.Supp. 541, 560 (S.D.N.Y.1969), *aff'd* 448 F.2d 872 (2d Cir. 1971), *cert. denied,* 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972).

The first of the three license agreement provisions on which plaintiff's claim of misuse relies appears at Paragraph 1(d):

> The Licencee shall be entitled to export the Products outside the Territory to any part of the World except Great Britain and any Country in respect of which Chemidus shall have granted to any other party a licence to manufacture the Products. Chemidus shall from time to time advise the Licencee in writing of such Countries in respect of which licences have been granted and are existing and such notification shall be conclusive and binding upon Chemidus and the Licencee.

Paragraph 1(a) defines the term "Products" as pipes and pipe fittings incorporating the patent in the form of a "Z-joint," and defines the term "Territory" as the United States and Puerto Rico. That defendant implemented the restrictions of this clause is not in dispute; by December 1, 1972, seventeen nations were off-limits to plaintiff's exports. They are identified in a list sent by defendant to plaintiff later in December. Def. Exh. 43.

Plaintiff's assertion that these restrictions on its export of pipe and pipe fittings manufactured by means of defendant's patented apparatus constitute misuse of the patent rests on the fact that the patent covers an apparatus for manufacturing a product rather than the product itself. As the Court noted in discussing a process patent in *United States v. Studiengesellschaft Kohle, M.B.H.,* "[t]his difference is real and is dispositive of Defendants' reliance by analogy on product patent cases." 426 F.Supp. 143, 148 (D.D.C.1976). The Court further analyzed the prerogatives and limitations which inhere in a process patent:

> Through certain restrictions on the use of his process, of course, the holder of a process patent may exert control over the end product. He could, for example, refuse to allow the use of his process at all and thus keep the product produced by that process off the market. [Citation omitted] The holder of a process patent could also decide to license only one company to use the process. That company would then have exclusive rights in regard to initial use or distribution of the product manufactured by that process. The holder of a process patent could not, however, license several companies to use the process and attempt to limit the manner in which some of those companies decide to use the ultimate product.

426 F.Supp. at 149 n. 3.

The *Studiengesellschaft* opinion concludes that the process patent holder there had only "the right to exclude others from making, using or selling his process. He therefore never had protection under the Patent Laws when he sought by whatever means to extend his process claim to restrict use or distribution of the unpatented product . . . ." *Id.* An earlier decision in which the same licensing agreement was at issue is to the same effect:

> [B]y granting a license which purports to give an exclusive right to sell an unpatented article, Dr. Ziegler has overstepped his rights under the patent law. He can restrict the use of his process, but he cannot place controls on the sale of unpatented articles produced by the process.

*Ethyl Corp. v. Hercules Powder Co.,* 232 F.Supp. 453, 457 (D.Del.1963). If "a process patent is not infringed by the sale of a product made by the process, the product itself not being patented," *In re Amtorg Trading Corp.,* 75 F.2d 826, 832, 22 CCPA 558, *cert. denied,* 296 U.S. 576, 56 S.Ct. 102, 80 L.Ed. 407 (1935), it follows that control of the distribution of unpatented products is not within the patentee's rights. These principles govern efforts to limit the export of unpatented products manufac-

tured by means of a patented apparatus. Contrary to defendant's assertions, neither the absence of a conspiracy nor the "know-how" provisions of clause 1(d) legitimate the restrictions incorporated in the clause. Further, the decisions defendant relies upon in support of clause 1(d) relate to product patents. *Moraine Products v. ICI America, Inc.,* 538 F.2d 134 (7th Cir. 1976); *Dunlop Co., Ltd. v. Kelsey-Hayes, Co.,* 484 F.2d 407 (6th Cir. 1973), *cert. denied,* 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1974).

■ The second clause on which plaintiff's claim of patent misuse is premised appears at paragraph 9(a) of the agreement:

> During the life of this Agreement the Licencee shall not at any time directly or indirectly contest the validity of the Patents or any of them or assist any other person to do so.

Though no-contest clauses indubitably are unenforceable against the licensee under *Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), such a clause, standing alone, is unlikely to constitute patent misuse, particularly if the patentee has indicated, as did defendant here, that the clause will not be enforced.[2] Def. Exh. 15; *see Panther Pumps & Equip. Co. v. Hydrocraft, Inc.,* 468 F.2d 225, 231–32 (7th Cir. 1972), *cert. denied,* 411 U.S. 965, 93 S.Ct. 2143, 36 L.Ed.2d 685 (1973).

■ The third clause on which the claim of misuse rests is Paragraph 10, which in part requires the plaintiff licensee to grant back to defendant certain rights related to any improvements made by licensee in the Z-joints produced by the patented apparatus:

> Chemidus will continually inform the Licencee of improvements made in the manufacture and production of the 'Z' Joint and in the manufacture and production of thermoplastic tubing (the know-how) and will allow the Licencee to use these improvements within the scope of this Agreement without extra payment.

The Licencee undertakes to inform Chemidus without delay of improvements found by the Licencee in the field of design and manufacture of 'Z' Joints. Chemidus upon their request will have the right to use these improvements and pertaining Patents and utility models free of charge and Chemidus will have the right to apply for Patents thereupon should it deem this desirable and authorise other Licencees to use the same improvements in the same way free of charge.

Paragraph A defines "Z Joint" only as "an integral joint for thermoplastic piping." Though the term "Z joint" was applied in these proceedings exclusively to products manufactured under defendant's patent, evidence at trial indicated that several competitors of defendant had developed processes for use in identical joints, the prime differences between the products concerned being that the groove formed by defendant's apparatus was smooth, whereas that formed by competitors apparatus contained tiny ridges; that defendant's apparatus was less expensive than that of competitors, and that defendant's apparatus was capable of producing larger pipe joints than were competitive devices. Testimony of J. M. Bunge, Tr. at 311–13. There is no indication that the joint itself is different in principle from joints produced by defendant's nearest competitors. Hence, it does not appear that the term "Z joint", standing alone, would be assumed to refer solely to joints manufactured by means of defendant's patented apparatus.

That the scope of clause 10 is susceptible to varying interpretation was suggested in correspondence between the parties in 1971–72. Plaintiff informed defendant that "[o]ur principal difficulty with [clause 10] rests in the accurate description of the area in which these contributions are to be made. We would assume that we would be concerned only with the specific 'Z' joint as defined by the patents, and to the specific

---

**2.** Defendant's motion to dismiss or stay this action in favor of arbitration did not constitute an attempt to enforce clause 9(a).

improvements that are associated with that particular joint." Def. Exh. 14 at 3–4. In response defendant agreed that "the area of interest must primarily be concerned with the method of formation as defined in the Patents." Def. Exh. 15 at 2. However, defendant also indicated its intention to "pass on to you" improvements in such other areas as "heating and cooling methods" and its assumption that plaintiff would reciprocate. *Id.* In any case, there is no evidence that plaintiff ever supplied, or was requested by defendant to supply, any specific information relating to improvements under the license agreement. Finally, by letter of September 30, 1977, defendant notified plaintiff that clause 10 as well as clause 9(a), the no-contest clause, were cancelled from the agreement. There being no indication that defendant intended thereby to repudiate the entire agreement, its letter of cancellation is in the nature of a waiver of its rights, if any, under clauses 9(a) and 10. *National Transformer Corp. v. France Mfg. Co.,* 215 F.2d 343, 360 (6th Cir. 1954) (licensor may waive by cancellation conditions or stipulations made in its own favor).

In determining whether patent misuse is present here, we must decide whether the license provisions, taken together and separately, tend to suppress competition outside the bounds of the rights accruing under the patent, or otherwise to enlarge the patent monopoly beyond its lawful scope. *See Morton Salt Co., supra,* 314 U.S. at 494, 62 S.Ct. 402; *Columbus Automotive Corp. v. Oldberg Mfg. Co.,* 264 F.Supp. 779, 783 (D.Colo.1967), *aff'd* 387 F.2d 643 (10th Cir. 1968) (per curiam). Under this standard, neither the no-contest clause contained in Paragraph 9(a) nor the grant-back provisions will support a finding of patent misuse here. Neither was ever enforced, and neither by its very presence in the agreement would exercise the degree of restraining influence on competition which might justify a finding of misuse. *Congoleum Industries, Inc. v. Armstrong Cork Co.,* 366 F.Supp. 220, 230 (E.D.Pa.1973), *aff'd* 510 F.2d 334 (3d Cir.), *cert. denied,* 421 U.S. 988, 95 S.Ct. 1991, 44 L.Ed.2d 478 (1975). Moreover, the grant-back provision here is not so

drafted as clearly to evidence an attempt to expand the licensor's entitlement beyond the scope of the patent, as was true in *Duplan Corp. v. Deering Milliken, Inc.,* 444 F.Supp. 648, 699–700 (1977).

Whether or not clauses 9(a) and 10 constitute patent misuse, we have concluded that the export limitation provision in clause 1(d), both by its intrinsic inhibiting effect on competition and by the fact that it has been enforced more or less continuously against the plaintiff, constitutes misuse of the patent. That plaintiff has demonstrated no harm to itself as a consequence is irrelevant, the concern here being the adverse effects on the public interest engendered by a patentee's efforts to control the distribution of unpatented products. *Morton Salt Co., supra,* at 494, 62 S.Ct. 402; *Krampe v. Ideal Industries, Inc.,* 347 F.Supp. 1384, 1386–87 (N.D.Ill.1972). As the Court in *Krampe* noted, that the illegal provision may never have been enforced in the United States is immaterial so long as the patentee has arrogated power beyond the scope of his monopoly under law. 347 F.Supp. at 1387. That the relevant competitive markets may be overseas is equally immaterial so long as the impermissible restraint is directed at United States exports. *See Continental Ore Co. v. Union Carbide & Carbon Co.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Pacific Seafarers, Inc. v. Pacific Far East Line, Inc.,* 131 U.S.App. D.C. 226, 239, 404 F.2d 804, 817 (1968), *cert. denied,* 393 U.S. 1093, 89 S.Ct. 872, 21 L.Ed.2d 784 (1969).

A judicial determination of patent misuse goes to the enforceability of the patentee's rights, and does not render the patent itself invalid. *Mercoid Corp., supra,* 320 U.S. at 669, 164 S.Ct. 268; *Ansul Co., supra* at 557. The equitable nature of the misuse doctrine vests the Court with discretion "in evaluating the actions of the patentee." *Koratron Co., Inc. v. Lion Uniform, Inc.,* 409 F.Supp. 1019, 1022 (N.D.Cal.1976). Apart from denying defendant's motions to strike the claim of misuse, we will defer consideration of the appropriate remedy hereunder until the remaining issues in the action have been resolved.

Accordingly, it is by the Court this 22nd day of March, 1978,

ORDERED, that defendant's motions to strike plaintiff's claim of patent misuse be, and hereby are, denied.