AMGEN, INC., Plaintiff,

v.

CHUGAI PHARMACEUTICAL CO.,
LTD. and Genetics Institute,
Inc., Defendants.

ORTHO PHARMACEUTICAL CORP., Ci-
lag Gesellschaft M.B.H., Cilag N.V., Ci-
lag Ltd., Cilag S.A.R.L., Cilag G.M.B.H.,
Cilag S.P.A., Cilag–Medicamenta, LDA.,
Johnson & Johnson S.A. (Cilag Divi-
sion), Cilag AB, Cilag AG, and Cilag AG
International, Plaintiffs,

v.

GENETICS INSTITUTE, INC. and
Amgen Inc., Defendants.

Civ. A. Nos. 87–2617–Y, 91–12174–Y.

United States District Court,
D. Massachusetts.

Dec. 3, 1992.

Allan van Gestel, Goodwin, Proctor & Hoar, Dale A. Malone, Allegretti & Witcoff, Ltd., Boston, MA, for Amgen, Inc.

Herbert Weissblum, Jager, Smith & Stetler, Boston, MA, Eugene M. Gelernter, Richard H. Savage, David F. Dobbins, Patterson, Belknap, Webb & Tyler, New York City, for Ortho Pharmaceutical Corp.

William F. Lee, Hale & Dorr, Boston, MA, Paul H. Heler, Karen J. Kramer, Scott A. Brown, Kenyon & Kenyon, New York City, Ian Crawford, Todd & Weld, Boston, MA, for Genetics Institute, Inc.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

## I. INTRODUCTION

### A. *The Underlying Actions*

The motions before the Court stem from two actions which were consolidated by this Court's order on August 27, 1991. The lead case, Civil Action No. 87–2617–Y, is a suit for patent infringement by Amgen, Inc. ("Amgen") against Genetics Institute, Inc. ("Genetics") and Chugai Pharmaceutical Co., Ltd. ("Chugai"). In the lead case, Amgen has already prevailed on the issue of liability: Amgen's U.S. Patent No. 4,703,008 ("the '008 patent") was determined to be valid and Genetics was found to have infringed it. *See Amgen, Inc. v. Chugai Pharmaceutical Co.,* 706 F.Supp. 94 (D.Mass.1989) *("Amgen I"), aff'd in part and rev'd in part, Amgen, Inc. v. Chugai Pharmaceutical Co.,* 927 F.2d 1200 (Fed.Cir.1991) *("Amgen II"), cert. denied,* —— U.S. ——, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991). The issue of damages remains to be litigated.

After the liability determination was made in the lead case, Ortho Pharmaceutical Corp. ("Ortho") and its co-plaintiffs filed the member case, Civil Action No. 91–12174–Y, against Genetics and Amgen. Ortho seeks damages for the infringement of the '008 patent.[1]

### B. *The Motions Before The Court*

Genetics now moves either to dismiss Ortho's amended complaint or for summary judgment on the grounds (i) that the amended complaint fails to state a claim upon which relief can be granted because Ortho and the Cilag co-plaintiffs lack standing to bring this action for patent infringement, (ii) that this Court lacks jurisdiction over the subject matter of the amended complaint, and (iii) that prior pending actions instituted elsewhere by Ortho require that the Court dismiss Ortho's amended complaint. Amgen also moves to dismiss Ortho's amended complaint for failure to state a claim on the ground that Ortho lacks standing to bring its action.[2]

Ortho and its co-plaintiffs cross-move pursuant to Federal Rules of Civil Procedure 42 and 56 for leave to intervene in the lead case for the limited purpose of moving for partial summary judgment limiting the damages recoverable by plaintiff Amgen.

## II. THE FACTUAL BACKGROUND

### A. *Amgen's '008 Patent*

This dispute centers around U.S. Patent No. 4,703,008 ("the '008 patent"), a patent issued in 1987 to Dr. Fu–Kuen Lin, an Amgen employee, who assigned his rights to the patent to Amgen. The claims in the '008 patent cover certain products of recombinant DNA technology used to produce Erythropoietin ("EPO"), an important therapeutic agent in the treatment of various blood disorders. More specifically, the '008 patent covers the purified and isolated DNA sequences encoding EPO and the host cells transformed or transfected

1. The plaintiff Ortho is a wholly owned subsidiary of Johnson & Johnson engaged in the business of research, development, and marketing of pharmaceutical products. The other plaintiffs (the "Cilag co-plaintiffs") are wholly-owned subsidiaries of Johnson & Johnson organized respectively under the laws of various European nations. Defendant Genetics is a Delaware corporation with its principal place of business in Massachusetts. Defendant Amgen is a Delaware corporation with its principal place of business in California.

It should be noted that Ortho and the Cilag co-plaintiffs, after filing the complaint, moved to realign defendant Amgen as a plaintiff, but the Court denied this motion on November 14, 1991.

2. Amgen also contends that Ortho fails to state a claim against Amgen for the simple reason that, while Ortho has named Amgen as a defendant, Ortho in fact seeks no relief from Amgen. Given that this Court has denied Ortho's motion to realign Amgen as a plaintiff, *see supra* n. 1, Amgen's contention is technically true. The analysis set forth herein, however, moots their point.

with a DNA sequence which are used to produce EPO. *Amgen II,* 927 F.2d at 1203–04. Thus the '008 patent does *not* cover the product EPO itself, which can also be produced by methods that do not use any recombinant DNA technology. *See id.* [3]

### B. *Ortho's License Agreements*

In 1984, three years prior to the issuance of the patent, Amgen and Kirin Brewery Company ("Kirin") established a joint venture, Kirin–Amgen, Inc. ("Kirin–Amgen"). At that time, Amgen assigned certain rights to Kirin–Amgen in the then pending application for the '008 patent.

On September 30, 1985, Ortho entered into Technology License Agreements ("TLA's") and Product License Agreements ("PLA's") with Kirin–Amgen and Amgen separately. From Kirin–Amgen, Ortho obtained (1) an "exclusive license" [4] to sell EPO manufactured using the inventions claimed in the '008 patent throughout the world (except in the U.S., China, and Japan) for all human use except diagnostics, and (2) the right to manufacture EPO, in one location, using the inventions claimed in the '008 patent for sales everywhere outside of the United States (except China and Japan) for all human use except diagnostics. In exchange, Kirin–Amgen received the right to royalties on Ortho's sales abroad. *See* PLA of Kirin–Amgen and Ortho, Articles 2 and 4, *reprinted in* Affidavit of Eugene Gelernter ("Gelernter Aff."), Exh. A.

From its license agreements with Amgen, Ortho obtained (1) an "exclusive license" to manufacture EPO using the invention claimed in the '008 patent, in one location, for use or sale in the U.S. for all

human use except dialysis and diagnostics, and (2) an "exclusive license" to manufacture EPO using the invention claimed in the '008 patent, in one location in the United States, for use and sale outside the United States (excluding China and Japan). *See* PLA of Amgen and Ortho § 2.01, *reprinted in* Gelernter Aff., Exh. B; TLA of Amgen and Ortho § 2.01, *reprinted in* Affidavit of Ian Crawford ("Crawford Aff."), Exh. F. In return, Amgen would receive royalties on Ortho's resulting sales of EPO in the U.S. *Id.* at § 4.01. [5]

Both the TLA and the PLA executed by Ortho and Amgen also contain the virtually identical section 8.02 entitled "Infringement by Third Parties." Section 8.02 establishes the rights and obligations of the parties with respect to bringing, defending, and maintaining any appropriate suit or action in the event of a third-party infringement of any licensed patents.

### C. *The Production and Sale of EPO by Genetics*

During the same period, Genetics manufactured EPO in the United States using inventions claimed under its '195 patent issued in June, 1987. Genetics had an agreement with Boehringer Mannheim ("Boehringer"), a German corporation, giving Boehringer the exclusive rights to distribute and sell in Europe EPO manufactured in the U.S. by Genetics under the '195 patent. Under this agreement Genetics made extensive sales of bulk EPO to Boehringer, amounting to $34,100,000.00. Gelernter Aff., Exh. C at 4. In turn, Boehringer made extensive retail sales of this EPO to its customers in Europe.

---

**3.** For more detailed scientific and historical background concerning EPO and the claims covered under the '008 patent, see *Amgen II,* 927 F.2d at 1203–04; *Amgen I,* 706 F.Supp. at 95–97, 106–11. *See generally* William R. Carlson, Erythropoietin: The Development of a Pharmaceutical Product (1988) (unpublished A.B. Thesis, Department of Molecular Biology, Princeton University).

**4.** The Court notes that both PLA's use the words "exclusive license" to describe the rights Ortho

obtains from Kirin–Amgen and Amgen respectively. Whether these words have the legal effect of making Ortho an exclusive licensee under patent law, however, is a question the Court resolves *infra* at 899–904.

**5.** The Court's reading of the Ortho–Amgen agreements indicates that they did not provide for Amgen to receive any royalties on Ortho's European sales. Neither Amgen nor Genetics has argued to the contrary.

### D. *The Resulting Litigation*

On October 27, 1987, the date the '008 patent issued, Kirin–Amgen assigned the patent to Amgen. On the same date, Amgen brought suit against Genetics for infringement of the '008 patent. Prior to the trial on the liability issue in the Amgen action, Ortho moved to intervene. Amgen opposed this motion and the Court denied the motion.[6]

The liability phase of the Amgen action was resolved in 1991: Genetics was adjudged to have infringed certain claims of the '008 patent. *See Amgen, Inc. v. Chugai Pharmaceutical Co.*, 706 F.Supp. 94 (D.Mass.1989) ("*Amgen I*"), *aff'd in part and rev'd in part, Amgen, Inc. v. Chugai Pharmaceutical Co.*, 927 F.2d 1200 (Fed. Cir.1991) ("*Amgen II*"), *cert. denied,* —— U.S. ——, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991).[7] Thus, the issue of liability having been resolved, all that remains to be litigated in this lead case is the issue of damages.

In August, 1991, Ortho and its co-plaintiffs brought an action for damages based on patent infringement against Genetics. Ortho, having obtained from Amgen and Kirin–Amgen the exclusive right to sell in Europe EPO manufactured under the '008 patent, sued to recover damages arising from lost EPO sales in Europe due to Genetics' bulk sale of EPO to Boehringer and Boehringer's retail sales of this EPO throughout Europe. Genetics and Amgen, granted leave to intervene, moved to dismiss Ortho's complaint or for summary judgment. Ortho subsequently amended its complaint to name Amgen as a defendant. As stated above, Genetics and Amgen here move again for dismissal or summary judgment on essentially the same grounds as in their earlier motions. Ortho and its co-plaintiffs cross-move for leave to intervene in the lead case, Amgen's action, for the limited purpose of moving for partial summary judgment to limit the damages recoverable by plaintiff Amgen in that action.

### III. THE CENTRAL ISSUES

### A. *The Ortho Action*

First, both Genetics and Amgen move for dismissal on the ground that Ortho and its Cilag co-plaintiffs lack standing to bring this infringement action. They contend that, as a general rule of patent law, only the patent owner can bring an infringement action with respect to the patent in issue. They acknowledge that there is a legal exception permitting an "exclusive licensee" to bring such an infringement action if it joins the patent owner, but they argue that neither Ortho nor any of the Cilag co-plaintiffs is an "exclusive licensee" for purposes of this patent infringement action.

Second, they state that, even if Ortho is held to be an exclusive licensee and thus has the "legal capacity" to sue, Ortho does not have "contractual standing" to sue because the terms of § 8.02 of both its TLA and its PLA with Amgen confer on Amgen an exclusive right to sue under the circumstances of this case.

In addition, Genetics contends that this Court lacks subject matter jurisdiction over Ortho's action. More specifically, Genetics claims the Court does not have subject matter jurisdiction because: (i) Ortho's claim of damages arises from the retail sales of the product EPO in Europe, but the '008 patent does not cover EPO, just the gene and host cells used to manufacture EPO; and (ii) the '008 patent's reach does not extend to foreign countries; and (iii) Ortho's damages are predicated on re-

---

6. Ortho's motion to intervene was not denied for lack of standing. It was denied on the grounds that the motion was untimely and that Amgen could adequately represent Ortho's interests with respect to the liability issue.

7. These decisions have elicited a variety of scholarly comment. *See* Dan L. Burk, *Biotechnology and Patent Law: Fitting Innovation to the Procrustean Bed,* 17 Rutgers Computer & Tech. L.J. 1, 66–69 (1991); R. Stephen Crespi, *Inventiveness in Biological Chemistry: An International Perspective,* U. Pat. [ & Trademark] Off. Soc'y 351, 358–65 (1991); Jeffrey P. Kushan, *Protein Patents and the Doctrine of Equivalents: Limits on the Expansion of Patent Rights,* 6 High Tech. L.J. 109, 110–11, 142 n. 126 (1991); Ann S. Viksnins, Comment, *Amgen, Inc. v. United States International Trade Commission: Designer Genes Don't Fit,* 76 Minn.L.Rev. 161 (1991).

tail sales in Europe by a foreign company (Boehringer) which is not a party to this action.

Finally, Genetics argues that prior pending actions instituted elsewhere by Ortho require that the Court dismiss Ortho's action in this forum. Genetics alleges that Ortho has pending actions in Germany and California seeking the same damages and relief.

### B. *The Amgen Action*

Ortho and its co-plaintiffs seek leave to intervene in Amgen's lead action for the limited purpose of moving for partial summary judgment to limit the damages Amgen may recover from Genetics. More specifically, Ortho seeks to limit Amgen's recovery to the royalties Amgen itself lost due to infringement by Genetics, thereby precluding Amgen from recovering damages arising from Ortho's lost profits due to loss of sales in Europe. As explained herein, the Court denies the cross-motion for leave to intervene on the ground that the dismissal of Ortho's consolidated action leaves the Court with no basis under Fed. R.Civ.P. 42 for granting Ortho leave to intervene. Thus the Court will not address the merits of Ortho's motion for partial summary judgment as to the damages Amgen may recover in its lead action against Genetics.

### IV. ANALYSIS

#### A. *The Ortho Action: The Standing of Ortho and the Cilag Co–Plaintiffs*

■ "The right to sue under the patent laws on a patent, as distinguished from the right to sue for a breach of contract concerning a patent, naturally depends upon those laws." *Philadelphia Brief Case Co. v. Specialty Leather Prods. Co.*, 145 F.Supp. 425, 427 (D.N.J.1956) *aff'd* 242 F.2d 511 (3rd Cir.1957). 35 U.S.C. § 154 (1988) provides in pertinent part that:

> Every patent shall contain ... a grant to the patentee ... of the right to exclude others from making, using, or selling the invention throughout the United States, and, if the invention is a process,

of the right to exclude others from using or selling throughout the United States, or importing into the United States, products made by that process[.]

Thus, "a patent provides its owner with the right to exclude others from making, using, and selling the claimed invention." *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 875 (Fed. Cir.1991). Under United States patent law, one seeking to recover money damages for the infringement of a U.S. patent must have held legal title to the patent at the time of infringement. *Arachnid, Inc. v. Merit Indus., Inc.*, 19 U.S.P.Q.2d (BNA) 1513, 1517, 939 F.2d 1574 (Fed.Cir.1991); *see also* III. P. Rosenberg, *Patent Law Fundamentals* § 17.09[1][b] at 17–151 (2d ed. 1975). It is undisputed that Amgen, not Ortho, held legal title to the '008 patent at the time of infringement by Genetics.

■ There is, however, an exception to this general rule. "An exclusive licensee generally has standing to sue for infringement against anyone operating without the stated authority in the stated area of exclusivity." 6 D. Chisum, *Patents* § 21.03[2][c] at 21–157 (1991); *see also Independent Wireless Telegraph Co. v. Radio Corp. of America*, 269 U.S. 459, 467–68, 46 S.Ct. 166, 169, 70 L.Ed. 357 (1926); *Kalman v. Berlyn Corp.*, 914 F.2d 1473, 1481–2 (Fed. Cir.1990); *Western Electric Co. v. Pacent Reproducer Corp.*, 42 F.2d 116, 119 (2d Cir.1930), *cert. denied*, 282 U.S. 873, 51 S.Ct. 78, 75 L.Ed. 771 (1930); *Sanofi, S.A. v. Med–Tech Veterinarian Prods., Inc.*, 222 U.S.P.Q. (BNA) 143, 149, 1983 WL 417 (D.Kan.1983); *Philadelphia Brief Case Co. v. Specialty Leather Prods. Co.*, 145 F.Supp. 425, 428 (D.N.J.1956) *aff'd* 242 F.2d 511 (3rd Cir.1957). Under this exception, the exclusive licensee "has the power to join the patent holder in a suit for infringement either as a willing or unwilling plaintiff or defendant, in order to enforce the right granted in the license." *Sanofi, S.A. v. Med–Tech Veterinarian Prods., Inc.*, 222 U.S.P.Q. (BNA) at 149 (citing *Independent Wireless*, 269 U.S. 459, 46 S.Ct. 166); *see also Kalman*, 914 F.2d at 1481–82; 6 Chisum, *Patents* § 21.03[2][c] at 21–157. It is well settled, however, that a

mere non-exclusive licensee has no standing to sue for infringement. *Kalman*, 914 F.2d at 1481 (citing *Waterman v. Mackenzie*, 138 U.S. 252, 255, 11 S.Ct. 334, 335, 34 L.Ed. 923 [1891]).

█ Therefore, the Court must determine whether Ortho or any of the Cilag co-plaintiffs is an exclusive licensee. "In its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent. Such a license grants to the licensee merely a privilege that protects him from a claim of infringement by the owner of the patent monopoly." *Western Electric Co.*, 42 F.2d at 118. An "exclusive license," however, provides the licensee with the legal grounds to prevent the patent owner from granting further licenses for the manufacture, use, and sale of the inventions claimed under the patent, either directly or by condoning infringing activity. *See id.* at 118, 119; *see also* 6 Chisum, *Patents* § 21.03[2][c] at 21-157 to 21-158.

█ A licensee can be deemed exclusive where the license pertains to less than all three of the rights granted under the patent, such as where the licensee has obtained only the exclusive right to *sell* the patented invention, *see Weinar v. Rollform, Inc.*, 744 F.2d 797 (Fed.Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1844, 85 L.Ed.2d 143 (1985). Furthermore, an exclusive license can be created by a grant of exclusivity based solely on geographic, time, or field-of-use limitations. 6 Chisum, *Patents* § 21.03[2][c] at 21-159; *see, e.g., Independent Wireless*, 269 U.S. 459, 46 S.Ct. 166 (exclusive licensee's field-of-use grant was limited to use of the patented invention for commercial radio purposes); *Pratt & Whitney Co. v. United States*, 153 F.Supp. 409, 139 Ct.Cl. 540 (1957) (exclusive licensee's field-of-use grant for the patented device was limited to use with engines in aircraft and guided missiles). Finally, it should be stressed that the test for exclusivity is *not* whether the license is exclusive *as against the licensor*, but rather whether the licensor has promised explicitly or implicitly not to grant any additional licenses to third parties. 6 Chisum, *Pat-*ents § 21.03[2][c] at 21-158; *see, e.g., Western Electric Co.*, 42 F.2d at 120 ("[A] license ... which reserves to the licensor, and to possible prior licensees, the privilege of practicing the invention, but contains an implied promise that the licensor will give no further license within the specified field of use, entitles the promisees to join with the licensor in an infringement suit."); *Research Frontiers Inc. v. Marks Polarized Corp.*, 290 F.Supp. 725, 727 (E.D.N.Y.1968); *Wing Engineering Corp. v. United States*, 151 F.Supp. 314, 315, 138 Ct.Cl. 260 (1957) (holding that where Wing was given the exclusive right to make, use, and vend the patented article, subject only to reservation that patent holder could do so as well, Wing was an exclusive licensee for standing purposes); *Philadelphia Brief Case Co.*, 145 F.Supp. at 428.

█ In essence, the theory behind permitting the exclusive licensee to sue for patent infringement is that such a licensee "comes so close to having a truly proprietary interest in the patent" that she should be entitled to sue. *Philadelphia Brief Case Co.*, 145 F.Supp. at 428; *see also* 6 Chisum, *Patents* § 21.03[2][c] at 21-157 to 21-158. To determine whether Ortho has such a proprietary interest, the Court must examine the legal effect of the substantive provisions of the license agreements. It is not dispositive that these agreements characterize Ortho's license as "an exclusive license." *Cf. Vaupel*, 944 F.2d at 875 ("whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name which it calls itself, but upon the legal effect of its provisions") (quoting *Waterman v. Mackenzie*, 138 U.S. 252, 256, 11 S.Ct. 334, 335, 34 L.Ed. 923 [1891]); *American Type Founders, Inc. v. Dexter Folder Co.*, 53 F.Supp. 602, 60 (S.D.N.Y.1943) ("Although the agreement is referred to as an 'exclusive license,' this is not conclusive as to its legal effect."). Thus, if the terms of the Ortho–Amgen Technology License Agreement and of their Product License Agreement preclude Amgen from granting further licenses under the patent within the stated area given to Ortho, then Ortho is

an "exclusive licensee" with the legal capacity to sue for patent infringement within this stated area.

■■■ It should be stressed, however, that it is not enough that the Ortho–Amgen agreements grant Ortho certain exclusive rights. It is also necessary that the infringement have occurred within Ortho's "stated area of exclusivity." 6 Chisum, *Patents* § 21.03[2][c] at 21–157. In other words, to be an exclusive licensee *for purposes of this infringement action against Genetics,* Genetics' adjudicated act of infringement must have infringed on one of Ortho's exclusive rights:

> It seems clear … that the owner of a patent who grants to another the exclusive right to make, use, or vend the invention, … must allow the use of his name as plaintiff in any action brought at the instance of the licensee in law or in equity to obtain damages *for the injury to his exclusive right by an infringer*[.]

*Independent Wireless,* 269 U.S. at 468, 46 S.Ct. at 169 (emphasis added). Therefore, before the Court examines the terms of the Amgen–Ortho agreements, the Court must clarify the nature of the patent infringement which Genetics has been adjudged to have committed.

The '008 patent covers the DNA sequences and transfected host cells used to manufacture EPO. In essence the patent covers certain products—machines or starting materials—used to manufacture EPO, but does not cover the product EPO itself.[8] Genetics infringed the '008 patent by using

the DNA sequences and transfected host cells covered by the patent to manufacture EPO in the United States.

While Ortho's arguments are not entirely clear, Ortho appears to be making two different arguments as to how this infringing act injured its exclusive rights thereby giving Ortho standing as an exclusive licensee to sue Genetics for patent infringement. These two arguments define differently the exclusive right which has been infringed. The Court will examine each of these in turn.

■■■■ First, Ortho contends that the license agreements give it the exclusive right to use the patented inventions in the United States to make EPO. Ortho admits that in these agreements Amgen reserves the right to use the patented inventions in the U.S. to make EPO for sale in the U.S. for diagnostic and dialysis purposes. Ortho correctly argues, however, that the exclusivity of its license to use the inventions claimed under the '008 patent in the U.S. to make EPO depends not on whether Amgen reserved the same right for itself, but rather on whether Amgen expressly or impliedly promised not to grant this right to other third parties. *See* discussion, *supra* at 899.

■■■ The Court therefore must determine whether the Ortho–Amgen agreements contain an explicit or implicit promise by Amgen not to grant any further licenses to third parties to manufacture EPO in the U.S. using the inventions claimed under the '008 patent.[9] Ortho in-

---

**8.** The Court emphasizes that the claims covered by the '008 patent are product claims, not process claims. *See Amgen I,* 706 F.Supp. at 110.

**9.** In determining the legal effect of the license agreements, the Court is required to interpret the terms of these agreements. None of the parties has briefed the question of which law the Court should apply in interpreting such contracts. That is, do federal courts, sitting in federal question jurisdiction patent cases rely on state contract law or do they apply some sort of federal common law of contracts? The few cases cited by the parties to support their particular interpretations of the disputed provisions in the license agreements do not reflect any consistent view or theory as to which law applies.

According to 6 Lipscomb, *Walker on Patents* § 20:58 at 202 (1987), "[t]he general rules of construction for contracts are applicable to the construction of patent licenses. The construction of patent license agreements is governed by state law." The Court adopts this view, and therefore applies California contract law because the license agreements specify that they are to "be construed in accordance with the internal laws, and not the law of conflicts, of the state of California applicable to agreements made and to be performed in that state." PLA § 10.8.

sists that it does contain such a promise. Ortho's Second Opposition Memorandum at 4. Genetics contends that it does not. Genetics' Reply Memorandum in Support of Motion to Dismiss and for Summary Judgment ("Genetics Reply Memorandum") at 3. Amgen never expressly contends that it retained this right to grant further licenses under its agreements with Ortho. Amgen's Reply to Ortho's Second Opposition Memorandum ("Amgen Reply Memorandum") at 4.

Ortho relies on section 2.01 of the Amgen–Ortho PLA. This provision grants Ortho "an exclusive license" to use the inventions claimed in the '008 patent for the manufacture of EPO in one location in the U.S. for (1) use or sale in the U.S. for all human use *except dialysis and diagnostics,* and (2) for use and sale outside the U.S. (excluding China and Japan). Implicitly, Amgen retains for itself the right to manufacture EPO in the U.S. under the '008 patent for use or sale *in the U.S.* for *dialysis and diagnostics.* Ortho admits this. Ortho Second Opposition at 4. Equally clearly, this provision precludes Amgen from licensing to any third parties the right to manufacture EPO in the U.S. under the '008 patent for sale abroad. This provision, however, does not expressly state whether Amgen also retains the right to grant additional licenses to use the patented '008 inventions in the U.S. to make EPO for use or sale *in the U.S.* for *dialysis and diagnostic purposes.*

The Court interprets § 2.01 as creating no such implied promise by Amgen not to sub-license its right to manufacture EPO in the U.S. using the inventions claimed under the '008 patent. The Court should "not read limitations into the [license] agreement which could have been readily inserted by the parties[.]" 6 Lipscomb, *Walker on Patents* § 20:58 at 203 (1987). It is true that § 2.01 refers to Ortho's license as an "exclusive license." The Court interprets this reference to an "exclusive license" to mean only that Amgen cannot license to a third party Ortho's exclusive right to manufacture EPO in the U.S. for sale abroad and not that Amgen can not sub-license its own right to manufacture EPO in the U.S.

for sale in the U.S. for diagnostics or dialysis.

The essence of Ortho's second argument is that section 2.01(b) of the PLA grants Ortho an exclusive field-of-use license and that Genetics' infringing act intruded upon this exclusive field-of-use. More specifically, Ortho argues it has the exclusive license to use the '008 patented inventions in the United States to make EPO *for the purpose of sale abroad.* Ortho's Second Opposition Memorandum at 2. Thus, Ortho states, Genetics infringed this exclusive right by using the claimed inventions in the U.S. to make EPO to be sold to Boehringer for resale in Europe. Therefore, Ortho concludes, it has standing as an exclusive licensee to sue Genetics for damages arising from this infringement.

In response, Genetics and Amgen essentially argue that Ortho confuses its exclusive right under the license agreement with its exclusive right under the patent. Because the territorial effect of the '008 patent, like any U.S. patent, is limited to the U.S., *see* 35 U.S.C. § 154; III P. Rosenberg, *Patent Law Fundamentals* § 18.01 (2d ed. 1975), and because the '008 patent covers only certain *products* used to make EPO, and not *EPO itself, see supra* pages 896–897, they argue Ortho has no such exclusive field-of-use right *under the '008 patent* to use the claimed inventions in the U.S. to make EPO *for sale abroad.* Thus Amgen and Genetics contend that Ortho may have such an exclusive right under contract law as against Amgen, but not under patent law as against a third-party infringer. In short, they claim that the exclusive right Ortho asserts is only contractual because (1) it exceeds the territorial boundaries of a United States patent, and (2) it is predicated on a field-of-use limitation which relates not to the use, sale, or making of the '008 patented inventions, but to the sale of the resulting unpatented EPO.

While Amgen and Genetics fail to offer any case law to support their view, their argument is persuasive at least with

respect to their second point.[10] The case law makes clear that the standing of an exclusive licensee can be predicated on the grant of an exclusive right to make, use, or sell a patented invention within a limited field. *See* discussion *supra* pages 899–900. If the field-of-use limitation in the license exceeds the scope of the patent, however, such a license may be enforceable under contract law, but is not enforceable under patent law. The parties do not cite, and this Court has not found, any case in which a court, in dealing with whether a licensee has standing as an exclusive licensee to sue a third party for patent infringement, has been faced with the issue of whether the field-of-use restrictions in the subject license exceed the scope of the patent. There is, however, significant case law in which the Supreme Court, as part of determining whether certain patent licenses violate antitrust law, has been faced with the issue of whether the field-of-use restrictions in licenses such as these exceeds the scope of the patent. The Supreme Court has had to evaluate whether the license granted by the patent owner contains a field-of-use limitation which goes beyond the scope of the patent since such a license is not shielded by patent law from the application of the antitrust laws. *See Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852 (1940). Thus, in *Ethyl Gasoline Corp.*, the Court states:

> The patent law confers on the patentee a limited monopoly, the right or power to exclude all others from manufacturing, using, or selling his invention. The extent of that right is limited by the definition of his invention, as its boundaries are marked by the specifications and claims of the patent. *He may grant licenses to make, use or vend, restricted in point of space or time, or with any other restriction upon the exercise of the granted privilege, save only that by attaching a condition to his license he*

*may not enlarge his monopoly* and acquire some other which the statute and the patent did not give.

309 U.S. at 456, 60 S.Ct. at 625 (citations omitted) (emphasis added). Similarly, in *United States v. General Electric Co.*, 272 U.S. 476, 489, 47 S.Ct. 192, 196, 71 L.Ed. 362 (1926), the Court states that "the patentee may grant a license to make, use, and vend articles under the specifications of his patent for any royalty or upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure."

While this Court is not faced with the question of whether the patent license in issue violates antitrust law, it too must determine whether the field-of-use restriction in the license Amgen granted to Ortho exceeds the scope of the '008 patent. The starting point for this determination is the claims covered by the '008 patent. The '008 patent covers *product* claims, not process claims. More specifically it covers specific products—certain DNA sequences and transfected host cells—which can be analogized to "machines" or "starting materials" used for manufacturing EPO. It does not cover the process of manufacturing recombinant EPO. *Amgen I*, 706 F.Supp. at 106–08. Nor does it cover the product EPO itself which is made through use of these machines. As this Court explained in *Amgen I*, "[a] product patent gives the patentee the right to restrict the use and sale of the *product* regardless of how and by whom it was manufactured. A process patentee's power extends only to those products made by the patented process." *Id.* at 107 (quoting *United States v. Studiegesellschaft Kohle*, 670 F.2d 1122, 1127–28 [D.C.Cir.1981]) (emphasis added).

The field-of-use limitation on Ortho's asserted exclusive license restricts Ortho's use of the patented DNA sequences and

---

10. The Court, however, disagrees with Amgen's and Genetics' first point contending that Ortho's asserted exclusive license exceeds the territorial limitations of the '008 patent. Were this Court to hold that the field-of-use limitation in the license was within the scope of the '008 patent, the Court would then hold that it does not exceed the territorial boundaries of the patent because it simply licenses the use of the patented invention *in the United States* for a particular purpose.

host cells to the making of EPO for sale abroad. If we analogize the DNA sequences and host cells to a machine, Ortho's asserted exclusive license then can be seen as a license to use a patented machine to make a certain unpatented product for sale abroad. Such a restriction on the sale of the unpatented product exceeds the scope of the patent on the machine. *See Robintech, Inc. v. Chemidus Wavin, Ltd.,* 450 F.Supp. 817 (D.D.C.1978). In *Robintech,* a patentee had granted a license for the restricted use of a patented apparatus to produce unpatented pipes and pipe fittings for export to certain countries outside the United States. The court held that patent law did not provide a basis for a patentee to use its patent on an apparatus to control the distribution of unpatented products made with the apparatus. *Id.* at 820–21. In granting a license with such a limitation, the court concluded, the patentee had "arrogated power beyond the scope of his monopoly under law." *Id.* at 822.

■■■ On this basis, this Court holds that a field-of-use license which grants an exclusive license to use the inventions claimed under the '008 patent (the DNA sequences and transfected host cells) in the U.S. to make an unpatented product (EPO) for sale abroad exceeds the scope of the '008 patent. Thus, the exclusive license Ortho asserts, that is to use the patented products to manufacture EPO in the U.S. for export, is merely exclusive under contract law as against Amgen, but is not exclusive under patent law as against third party infringers. Hence, as matter of law, Ortho lacks standing as an exclusive licensee to sue Genetics for infringing the '008 patent.[11] Having determined that Ortho is not an exclusive licensee, the Court must also conclude that the Cilag co-plaintiffs are not exclusive licensees because, as sub-licensees of Ortho, their rights are derivative of Ortho's.[12]

For the foregoing reasons, the motions for dismissal and for summary judgment by Genetics and Amgen are ALLOWED.[13]

**11.** Ortho also argues that as a matter of equity and policy it should have standing to sue here because it is the only party which can recover from Genetics those damages resulting from lost European sales. As it also argues in its motion to intervene in the lead case, Ortho contends that Amgen is not entitled to recover damages for lost European sales because Amgen, under the license agreements, is not entitled to any royalty payments from Ortho on such sales. Whatever the merits of this argument may be, it cannot provide the basis for standing. The key question for determining standing of a licensee is whether the licensee as matter of law has an exclusive property interest in the patent itself, not whether the licensee in fact has been harmed by a third-party infringer. As Judge Learned Hand explained in *A.L. Smith Iron Co. v. Dickson,* 141 F.2d 3, 6 (2d Cir.1944), there are strong policy reasons why patent law does not confer standing on a nonexclusive licensee to sue a third party for infringement even though the licensee has suffered due to the infringement:

It is indeed true that a mere licensee may have an interest at stake in such a suit; his license may be worth much more to him than the royalties which he has agreed to pay, and its value will ordinarily depend on his ability to suppress the competition of his rivals. The reason why he is not permitted to sue is not because he has nothing to protect. But against that interest is the interest of the infringer to be immune from a second suit by the owner of the patent; and also the interest

of the patent owner to be free to choose his forum.... Indeed, the owner may have granted a number of licenses, and it would be exceedingly oppressive to subject him to the will of all his licensees. These two interests in combination have been held to over-weigh any interest of the licensee[.]

**12.** The Court notes that the co-plaintiffs would *not* have standing to sue as exclusive licensees even if Ortho were determined to have such legal capacity. This is because the sub-licenses the co-plaintiffs received from Ortho do not involve any right of *manufacture* of EPO under the '008 patent *in the U.S.* These sub-licenses only grant each Cilag affiliate the exclusive right to *sell* EPO in a particular country *abroad.* Thus, Genetics' act of infringement—the use of the patented inventions to *manufacture* EPO *in the United States*—did not infringe on the exclusive rights of these affiliates. Therefore they lack the legal capacity to sue Genetics even if Ortho does not.

**13.** Having determined as matter of law that Ortho and its co-plaintiffs are not exclusive licensees for the purpose of suing Genetics for infringement of the '008 patent, the Court need not address the issues raised by the parties concerning the allocation of the right to sue under section 8.02 of the PLA. A contractual provision providing a licensee with a right to sue cannot confer on that licensee a right to sue *under the patent laws* where there is no such right under the patent laws. *See* 6 Chisum,

**B.** *The Amgen Action: Ortho's Cross–Motion to Limit the Damages Amgen May Recover*

 Ortho and its co-plaintiffs have also filed a cross-motion for leave to intervene in the lead case for the limited purpose of moving for partial summary judgment limiting the damages recoverable by plaintiff Amgen in that action. Their pleading states that they bring this cross-motion pursuant to Rules 42 and 56 of the Federal Rules of Civil Procedure. Ortho's Cross–Motion for Leave to Intervene at 2. Neither of these rules, however, provides a basis for here permitting Ortho's intervention in the lead case now that Ortho's own action has been dismissed for lack of standing. Rule 42(a) explains the circumstances wherein a federal court may consolidate actions pending before it.[14] This rule might permit the intervention Ortho seeks if Ortho's action were still alive. Given, however, that this Court has dismissed Or-

tho's action, the Court no longer has two consolidated cases before it. Therefore, Rule 42 cannot provide a basis for granting Ortho's cross-motion to intervene. Nor do Rule 42(b) or Rule 56 provide a basis for allowing Ortho to intervene. Rule 42(b) governs when a federal court may hold a separate trial on one or more of the claims in a case. Rule 56 governs motions for summary judgment. Thus, without addressing the substantive merits of Ortho's motion for partial summary judgment, this Court DENIES Ortho's cross-motion for leave to intervene.[15]

SO ORDERED.

Patents § 21.03[2][e] at 21–161 (citing *inter alia Crown Die & Tool Co. v. Nye Tool & Mach. Works,* 261 U.S. 24, 43 S.Ct. 254, 67 L.Ed. 516 [1923]; *Agrashell, Inc. v. Hammons Prod. Co.,* 352 F.2d 443, 446 [8th Cir.1965]; *Philadelphia Brief Case Co.,* 145 F.Supp. at 130).

**14.** Rule 42 provides:

(a) *Consolidation.* When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

(b) *Separate Trials.* The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

**15.** I conclude, based on the information before the Court, that Ortho's motion for intervention should be denied even if treated as a motion brought pursuant to Fed.R.Civ.P. 24. Rule 24, entitled "Intervention," sets forth the requirements for "intervention of right" and "permissive intervention." Rule 24(a), governing intervention of right, requires a court to grant intervention where:

Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Rule 24(b), governing permissive intervention, explains when a court may, but is not required to, permit intervention:

Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

**Rule 24(a) Analysis:** There is no federal statute conferring on Ortho an unconditional right to intervene in the case at bar. Therefore, Ortho only can intervene of right if it meets four requirements:

(1) *its application must be* "timely";
(2) it must claim an interest relating to the property or transaction which is the subject of the action;
(3) it must be so situated that the disposition of the action may as a practical matter impair or impede [its] ability to protect that interest; and

(4) it must show that its interest will not be adequately represented by Amgen and/or Genetics.

*Travelers Indem. Co. v. Dingwell,* 884 F.2d 629, 637 (1st Cir.1989).

The four-factor approach to evaluating timeliness is set forth in *Banco Popular de Puerto Rico v. Greenblatt,* 964 F.2d 1227 (1st Cir.1992). Ortho would appear to have no difficulty meeting the inadequacy of representation requirement by virtue of the fact that Genetics and Amgen appear close to settlement. *See Conservation Law Foundation,* 966 F.2d at 44. While it may have more difficulty meeting the timeliness requirement, Ortho most clearly does not satisfy the second requirement—the interest requirement. The First Circuit's approach to determining whether an applicant's claimed interest justifies intervention of right is set forth in *Conservation Law Foundation, Inc. v. Mosbacher,* 966 F.2d 39 (1st Cir.1992). The First Circuit follows neither the liberal approach of the D.C. Circuit and three other circuits, nor the more restrictive approach of the Courts of Appeals for the Fifth, Seventh, Eleventh, and Federal Circuits. *Id.* at 41–43. Instead, the First Circuit requires *inter alia* that "the interest must be direct, not contingent." *Id.* at 42 (quoting *Travelers Indem.,* 884

F.2d at 638). While Ortho may have an interest in preserving Genetics' assets so that, if Ortho obtains a judgment in another pending action in which Genetics is a defendant, *see supra* at 898, Ortho will be able to recover damages, this is only a contingent interest because it depends on the contingency of Ortho's success in some other suit. *See generally id.* at 42 (discussing ruling in *Travelers Indem.,* 884 F.2d at 638–39 that the applicant's interest was only contingent and therefore did not merit intervention of right). Because Ortho does not appear to satisfy the interest requirement, intervention must be denied under Rule 24(a).

**Rule 24(b) Analysis:** Likewise, Ortho cannot satisfy the requirements for permissive intervention. As a threshold matter, an applicant for intervention under Rule 24(b) must establish an independent basis for jurisdiction. *International Paper Co. v. Jay,* 887 F.2d 338, 346 (1st Cir. 1989). This Court has ruled that Ortho lacks the legal standing to state a claim against Genetics under the patent law. Ortho appears to have no other claim against Genetics that could confer federal jurisdiction. Therefore, without even considering whether Ortho meets the other requirements of Rule 24(b), this Court must deny Ortho's application for permissive intervention.